J-S70020-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: J.R.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.P. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 782 MDA 2017 |

Appeal from the Decree Entered April 12, 2017
In the Court of Common Pleas of Luzerne County Orphans' Court at No(s):
A-8513

| IN THE INTEREST OF: A.R.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 783 MDA 2017 |

Appeal from the Decree Entered April 12, 2017
In the Court of Common Pleas of Luzerne County Orphans' Court at No(s):
A-8514

BEFORE:  GANTMAN, P.J., SHOGAN, J., and OTT, J.

MEMORANDUM BY SHOGAN, J.:                **FILED DECEMBER 28, 2017**

C.P. ("Mother") appeals from the April 12, 2017 decrees in the Court of
Common Pleas of Luzerne County that terminated her parental rights
pursuant to 23 Pa.C.S. § 2504, with respect to her son, J.R.M., born in
October of 2013, and daughter, A.R.P., born in March of 2007 (collectively,

"the Children").[1]  N.T., 4/12/17, at 10.  After careful review, we vacate both decrees.

We summarize the relevant facts and procedural history as follows: The Children were placed in the custody of Luzerne County Children and Youth Services ("CYS") on March 25, 2015, due to Mother's and Father's drug and alcohol use and concerns regarding housing.  N.T., 4/12/17, at 10; Petition for Termination of Parental Rights, 11/28/16, at ¶ 10.  CYS placed the Children in kinship foster care with A.R. ("Foster Mother"), their maternal aunt.  N.T., 4/12/17, at 84.  At all times up to and including the date of the termination hearing on April 12, 2017, Mother visited with the Children "on a daily basis."  *Id*. at 28.  On November 28, 2016, CYS filed petitions for the involuntary termination of Mother's and Father's parental rights.  By order dated November 17, 2016, and filed November 28, 2016, the trial court appointed Richard Wojtowicz, Esquire, to represent Mother.

On December 13, 2016, Mother executed the following documents with respect to the Children at the CYS office in the presence of two CYS employees: (1) consent to adoption; (2) voluntary relinquishment of parental rights colloquy ("colloquy"); and (3) acknowledgment of voluntary relinquishment procedure ("acknowledgment").  Court-appointed counsel

_____

[1] On April 12, 2017, the orphans' court involuntarily terminated the parental rights of the Children's father, M.M. ("Father").  Father did not file a notice of appeal nor is he a party to this appeal.

- 2 -

was not present, nor is there any indication in the record that he had notice of the meeting. N.T., 4/12/17, at 17. In the acknowledgment, Mother agreed not to proceed with the subsequent voluntary relinquishment procedure, which would require her to appear for a voluntary relinquishment hearing. Instead, she acquiesced that CYS would request the court to confirm her consent to the adoption of the Children. N.T., 4/12/17, at 16. On March 13, 2017, CYS filed petitions to confirm Mother's consent to adoption with respect to the Children. *Id*. at 11.

The orphans' court held a hearing on the aforesaid petitions on April 12, 2017, during which CYS presented the testimony of its casework supervisor, Allison Miller, who was assigned as the Children's caseworker in January, 2016. N.T., 4/12/17, at 8–9. At this hearing, Mother was represented by new court-appointed counsel, Robert L. Kobilinski, Esquire, who succeeded Mr. Wojtowicz.[2] As noted, Mr. Wojtowicz was not present

---

[2] It is not clear from the certified record when the orphans' court appointed Mr. Kobilinski to represent Mother in the termination matter. CYS counsel stated at the confirmation-of-consent hearing on April 12, 2017, that Mr. Kobilinski had "mistakenly" been appointed for Father" and requested "an amended order correcting it." N.T., 4/12/17, at 7–8. Thus, Mr. Kobilinski was erroneously appointed for Father, not Mother, at some unknown date, and the appointment order was not corrected until April 12, 2017. During the April 12, 2017 hearing, Mr. Kobilinski told the court he was appointed "maybe 30 days ago," that is, in mid-March, 2017. N.T., 4/12/17, at 33. The record also reveals that Mother did not learn of the appointment of Mr. Kobilinski until March 20, 2017, at the earliest, and never spoke to Mr. Kobilinski until roughly March 28, 2017, two weeks before the instant hearing. N.T., 4/12/17, at 51, 52–53.

when Mother executed the documents on December 13, 2016. N.T., 4/12/17, at 31-32. Further, Mr. Wojtowicz was on vacation at an unspecified time in December of 2016, and he subsequently retired. *Id.* at 33. At the April 12, 2017 hearing, Mr. Kobilinski asserted that Mother was effectively without legal counsel from December of 2016 until new counsel's appointment. *Id.* at 33, 39. For this reason, Mr. Kobilinski argued during the hearing that the documents executed by Mother were not valid. *Id.* at 31-32, 38-39. Mother testified on her own behalf to this effect.

By decrees dated April 12, 2017, the orphans' court granted the petitions to confirm Mother's consent to the adoption of the Children and terminated her parental rights. On April 13, 2017, the court amended the decree with respect to J.R.M. for the purpose of correcting his middle name. Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The orphans' court filed its Rule 1925(a) opinion on June 8, 2017.

> On appeal, Mother presents the following issues for our review:
>
> Whether the [orphans'] [c]ourt erred in terminating the parental rights of [the Children], as testimony offered did not establish by clear and convincing evidence the requirements of the Adoption Act of 1980, October 15, P.L. 934, No. 163, 1, 23 [Pa.]C.S.A. Section 2504[?]
>
> Whether the [orphans'] [c]ourt abused its discretion/erred in terminating parental rights of [Mother], as she had not been given effective assistance of counsel at the time she signed a

voluntary confirmation of consent to adoption of her minor children[?]

Whether the [orphans'] [c]ourt committed an error of law in the [c]ourt's decision to terminate [Mother's] parental rights by improperly accepting [CYS's] petition to confirm adoption due to the fact that [Mother] produced this document without the effective assistance of counsel[?]

Mother's Brief at 3-4.

Mother's issues involve our interpretation and application of the Adoption Act (" the Act"), 23 Pa.C.S. § 2101-2938. This Court has explained this process as follows:

> "The interpretation and application of a statute is a question of law that compels plenary review to determine whether the court committed an error of law." **Wilson v. Transport Ins. Co.**, 889 A.2d 563, 570 (Pa. Super. 2005). "As with all questions of law, the appellate standard of review is *de novo* and the appellate scope of review is plenary." **In re Wilson**, 879 A.2d 199, 214 (Pa. Super. 2005) (*en banc*). Further,

> > we are constrained by the rules of statutory interpretation, particularly as found in the Statutory Construction Act. 1 Pa.C.S.A. §§ 1501-1991. The goal in interpreting any statute is to ascertain and effectuate the intention of the General Assembly. Our Supreme Court has stated that the plain language of a statute is in general the best indication of the legislative intent that gave rise to the statute. When the language is clear, explicit, and free from any ambiguity, we discern intent from the language alone, and not from the arguments based on legislative history or "spirit" of the statute. We must construe words and phrases in the statute according to their common and approved usage. We also must construe a statute in such a way as to give effect to all its provisions, if possible, thereby avoiding the need to label any provision as mere surplusage.

***Cimino v. Valley Family Medicine***, 912 A.2d 851, 853 (Pa. Super. 2006) (quoting ***Weiner v. Fisher***, 871 A.2d 1283, 1285-86 (Pa. Super. 2005)). ***See also*** 1 Pa.C.S.A. § 1921(b). Under Section 1921(c), the court resorts to considerations of "purpose" and "object" of the legislature when the words of a statute are not explicit. ***Sternlicht v. Sternlicht***, 583 Pa. 149, 876 A.2d 904, 909 (2005) (referring to consideration of matters such as: (1) occasion and necessity for statute; (2) circumstances under which it was enacted; (3) mischief to be remedied; (4) object to be attained; (5) former law, if any, including other statutes upon same or similar subjects; (6) consequences of particular interpretation; (7) contemporaneous legislative history; (8) legislative and administrative interpretations of such statute). Finally,

> It is presumed that the legislature did not intend an absurd or unreasonable result. In this regard, we . . . are permitted to examine the practical consequences of a particular interpretation.

***Commonwealth v. Diakatos***, 708 A.2d 510, 512 (Pa. Super. 1998).

***In re Adoption of J.A.S.***, 939 A.2d 403, 405-406 (Pa. Super. 2007).

The pertinent provisions of the Act are as follows, in relevant part:

**§ 2504. Alternative procedure for relinquishment**

**(a)** **Petition to confirm consent to adoption.—**If the parent or parents of the child have executed consents to an adoption, upon petition by the intermediary or, where there is no intermediary, by the adoptive parent, the court shall hold a hearing for the purpose of confirming a consent to an adoption upon expiration of the time periods under section 2711 (relating to consents necessary to adoption). The original consent or consents to the adoption shall be attached to the petition.

23 Pa.C.S. § 2504(a).

**§ 2711. Consents necessary to adoption**

**(a) General rule.**—Except as otherwise provided in this part, consent to an adoption shall be required of the following:

\* \* \*

(3) The parents or surviving parent of an adoptee who has not reached the age of 18 years.

\* \* \*

**(c) Validity of consent.**—No consent shall be valid if it was executed prior to or within 72 hours after the birth of the child. . . . A consent to an adoption may only be revoked as set forth in this subsection. The revocation of a consent shall be in writing and shall be served upon the agency or adult to whom the child was relinquished. The following apply:

(1) Except as otherwise provided in paragraph (3):

\* \* \*

(ii) For a consent to an adoption executed by a birth mother, the consent is irrevocable more than 30 days after the execution of the consent.

(2) An individual may not waive the revocation period under paragraph (1).

(3) Notwithstanding paragraph (1), the following apply:

(i) An individual who executed a consent to an adoption may challenge the validity of the consent only by filing a petition alleging fraud or duress within the earlier of the following time frames:

(A) Sixty days after the birth of the child or the execution of the consent, whichever occurs later.

(B) Thirty days after the entry of the adoption decree.

(ii)  A consent to an adoption may be invalidated only if the alleged fraud or duress under subparagraph (i) is proven by:

(A)  a preponderance of the evidence in the case of consent by a person 21 years of age or younger; or

(B)  clear and convincing evidence in all other cases.

**(d)  Contents of consent.—**

(1)  The consent of a parent of an adoptee under 18 years of age shall set forth the name, age and marital status of the parent, the relationship of the consenter to the child, the name of the other parent or parents of the child and the following:

I hereby voluntarily and unconditionally consent to the adoption of the above named child.

I understand that by signing this consent I indicate my intent to permanently give up all rights to this child.

I understand such child will be placed for adoption.

I understand I may revoke this consent to permanently give up all rights to this child by placing the revocation in writing and serving it upon the agency or adult to whom the child was relinquished.

* * *

If I am the birth mother of the child, I understand that this consent to an adoption is irrevocable unless I revoke it within 30 days after executing it by delivering a written revocation to (insert the name and address of the agency coordinating the adoption) or (insert the name and address of an attorney who represents the individual relinquishing parental rights or prospective adoptive parent of the

child) or (insert the court of the county in which the voluntary relinquishment form was or will be filed).

I have read and understand the above and I am signing it as a free and voluntary act.

(2) The consent shall include the date and place of its execution and names and addresses and signatures of at least two persons who witnessed its execution and their relationship to the consenter.

23 Pa.C.S. §§ 2504, 2711.

With these provisions in mind, we turn to the merits of Mother's issues on appeal.[3] Initially, we acknowledge that Mother did not revoke her consents to adoption in writing within thirty days or at any time after execution of the consents. 23 Pa.C.S. § 2711(c)(1)(ii). In addition, Mother did not file petitions alleging fraud or duress within sixty days or at any time after execution of the consents. 23 Pa.C.S. § 2711(c)(3)(i)(A). Rather,

_____

[3] We are compelled to note that Mother's brief does not comply with Pa.R.A.P. 2119(a) in that it does not divide the argument section into as many parts as there are questions to be argued. Indeed, Mother does not divide the argument into any separate parts nor does she distinctively display any particular point. *See* Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent"). Pa.R.A.P. 2101 underscores the seriousness with which this Court takes deviations from procedural rules, as we may quash or dismiss an appeal if an appellate brief has substantial defects. *See* Pa.R.A.P. 2101 (Conformance with Requirements). Here, we address Mother's arguments insofar as we are able to discern them, noting that Mother's first issue is wholly abandoned in her brief.

Mother has asserted that she was without the effective representation of counsel throughout the process.

We summarize Mother's arguments. Mother argues that she "had no legal representation" within thirty to sixty days after executing the consents to adoption. Mother's Brief at 15. Mother argues she was unable to discuss the possibility of signing a revocation of consent with her counsel because when she contacted Mr. Wojtowicz a few days later with "second-thoughts," he told her he was going on vacation and advised her to call him again after he returned. *Id.* at 14, 18. Mother maintains that he never took her calls upon his return, and then he retired. In addition, Mother contends that CYS never advised her that she had the right to have counsel present when she signed the documents. *Id*. at 20.

Mother therefore advances a claim of ineffective assistance of counsel during the applicable thirty or sixty-day statutory period. Mother argues as follows:

> [Mother], as an indigent party, indeed was [not] afforded the protection of legal counsel under the law. The ineffectiveness of this counsel by not contacting her to discuss the legal significance of a voluntary relinquishment of parental rights led [Mother] to, in fact, sign a voluntary relinquishment and . . . consent to adoption, which were ultimately the cause of the decree[s] of termination.

Mother's Brief at 17–18.

This Court has explained an indigent person's right to counsel in a termination of parental rights case as follows:

> The unique nature of parental termination cases has long been recognized by the Supreme Court of Pennsylvania. Thus, ***In Re: Adoption of R.I.***, 312 A.2d 601 (Pa. 1973), the Supreme Court held that an indigent parent in a termination of parental rights case has a constitutional right to counsel. **The right to counsel in parental termination cases is the right to effective assistance of counsel even though the case is civil in nature**. ***In Re: Adoption of T.M.F.***, 573 A.2d 1035 (Pa. Super. 1990) (*en banc*); ***see also In the Interest of S.W.***, 781 A.2d 1247 (Pa. Super. 2001). However, this right is more limited than that in criminal cases, as claims of ineffective assistance of counsel must be raised on direct appeal. We then review the record as a whole to determine whether or not the parties received a "fundamentally fair" hearing; a finding that counsel was ineffective is made only if the parent demonstrates that counsel's ineffectiveness was "the cause of the decree of termination." ***T.M.F.***, 573 A.2d at 1044; ***see also S.W.***, 781 A.2d at 1249.

***In the Interest of J.T.***, 983 A.2d 773, 774–775 (Pa. Super. 2009) (emphasis added).

In its Pa.R.A.P. 1925(a) opinion, the orphans' court found that it must first review the timeliness of Mother's request to revoke or challenge the validity of her consents to adoption prior to addressing whether her consents were valid. In so doing, the orphans' court rejected Mother's ineffective-assistance-of-counsel claims. It concluded that Mother failed to revoke her consent to adoption within thirty days from the date of her consent to adoption and that her consent was knowing, voluntary, and deliberate "regardless of her claim that she did not receive effective assistance of counsel." Orphans' Court Opinion, 6/8/17, at 5. We conclude the record compels otherwise.

- 11 -

Allison Miller testified that when she served Mother with the involuntary termination of parental rights petition on November 30, 2016, Mother indicated that she had been speaking to Foster Mother "about the possibility of signing over guardianship" to her. N.T., 4/12/17, at 12, 21. Ms. Miller stated that she proceeded to advise Mother "that there was [sic] different ways if she wished to do a voluntary. She would be able to either do that by coming into the office to sign the paperwork or by coming into the hearing and verbalizing her desire to voluntarily relinquish her parental rights." *Id*. Ms. Miller subsequently scheduled an appointment for the confirmation of consents for December 13, 2016. *Id*. at 12–13.

The December 13, 2016 appointment occurred at CYS offices. N.T., 4/12/17, at 15. Ms. Miller explained that Mother had questions about the process and "especially in regards to the colloquy, which we had her sign prior to the consent." *Id*. at 14. Ms. Miller continued to extend advice to Mother and explained:

> that she already had signed the consent . . . and that was her intention for the minor children to be adopted. I also explained . . . that by signing this document, if she chose not to attend the voluntary relinquishment hearing . . . the Agency would be able to testify on her behalf. But that if she did attend, she may have to take the stand and indicate to the [c]ourt why she would wish to relinquish her parental rights.

*Id*. at 16. Regarding the colloquy signed prior to the consents, CYS counsel asked Ms. Miller if Mother requested the presence of counsel, and Mother replied that he "just was not really helping her in this matter." *Id*. at 17.

Ms. Miller further acknowledged that Mother "was very tearful" and stopped numerous times during Ms. Miller's explanation of the colloquy. N.T., 4/12/17, at 18. Ms. Miller admitted that "[i]t was very hard for [Mother] to sign these documents. I know that she loves her children very, very much. Her children love her as well." *Id*. at 24. Ms. Miller noted:

> Specifically on the question number 15 of the colloquy, when we read to her, do you understand that if you voluntarily relinquish your parental rights[,] your rights to [the Children] are forever ended and your child[ren] would be placed for adoption, she did ask us on that particular question, so you mean to tell me if I get my life back in order in five years, I wouldn't be able to get my children back . . .[?]

*Id*. at 18. Ms. Miller discerned that Mother mistakenly "thought that by signing the documents it would be a matter of transferring guardianship of the two children over to [Foster Mother]," and she described Mother as "appear[ing] to be in shock." *Id*. at 20, 25. Ms. Miller acknowledged that Foster Mother subsequently told Ms. Miller on December 29, 2016, that Mother "was thinking about revoking her consent." *Id*. at 19, 26.

Mother told the orphans' court she "feel[s] like I'm a 5th grader standing up in court. I hear the laws and what's being presented to me, but I'm not sure I understood, but I tried to understand." N.T., 4/12/17, at 44. Mother testified that Attorney Wojtowicz never gave her any advice, and when she brought up any concerns, he "put [her] down and [told her] that [she] was floating on a cloud." *Id*. at 53. She did not speak with counsel before signing the consents on December 13, 2016, and when she contacted

him a few days later, counsel told Mother he was going on vacation. *Id*. at 52–53. When Mother tried to reach counsel, he did not take her calls and did not call her back. *Id*. Mother stated that she did not know she could get a different attorney, professing: "I thought that was my attorney and I had to stick with him. I never had the option or being told by anybody that I had the option to get another attorney." *Id*. at 55.

CYS counsel asked Mother if she tried to get a new lawyer once she knew Attorney Wojtowicz retired. Mother responded:

> I found there was a free place there for public defenders, lawyers. I went to the 5th floor to the lawyers and they told me they do not do anything for children, like where I'm at with Children and Youth.
>
> So then I proceeded to go to the third floor and I got a bunch of paperwork to fill out but they told me I was going to need at least a month and a half for even free I guess, but nothing ever came of it.

N.T., 4/12/17, at 58–59.

Our review of the record reveals that the orphans' court's conclusions are not supported therein. Regarding Mother's assertion that Mr. Wojtowicz was unavailable during the thirty-day period during which Mother could have revoked her consents because he went on vacation and then did not return her telephone calls, the orphans' court found that Mother did not indicate she tried to call her counsel for the sole purpose of intending to revoke her consent. Trial Court Opinion, 6/8/17, at 9. The record is clear that Mother hesitated about professing consent, she had no counsel to advise her, and

- 14 -

her efforts to reach her counsel in the ensuing thirty-day period were rebuffed. The orphans' court's theory that because CYS told Mother she could revoke the consents herself within thirty days and she understood its advice, her claim had no merit, is not relevant. Mother was entitled to effective representation by counsel, and this record reveals that Mother did not receive it.

Thus, we have no hesitation in concluding that Mother was deprived of effective representation by counsel at every turn.[4] At the December 13, 2016 meeting with the CYS caseworker, Mother's court-appointed counsel was not present, and Ms. Miller offered explanation and advice. When Mother attempted to contact her counsel a few days after signing the consents, and within the thirty-day period in which she could revoke them, counsel told Mother he was going on vacation and to call him back. When Mother called him back, he refused her calls, and subsequently retired without ever contacting Mother. Mother's efforts to obtain new counsel were unfruitful for a variety of reasons, not the least of which was Mother's misunderstanding of the nature of the court appointment. When new

_____

[4] CYS's assertion that Mother had counsel present at the "hearing" held two days after she signed the consents is specious, and counsel's suggestion borders on the absurd. First, as previously noted, Ms. Miller "advised" Mother she need not be present at the hearing. Second, the orphans' court compelled CYS counsel to clarify that there actually was no hearing; it merely was "the call of the list" "to schedule [a] date for the [termination] hearing." N.T., 4/12/17, at 35.

counsel eventually was appointed, he was erroneously appointed for Father, not Mother, and the correction was not made until the April 12, 2017 hearing. Mother did not learn of the appointment of new counsel until two weeks before the April hearing, well beyond the thirty and sixty-day statutory periods.

Our courts have acknowledged that termination of parental rights "is a drastic measure that should not be taken lightly" because the parent's rights to her child are at stake as well as the child's relationship with his or her parent. **In re Adoption of Stickley**, 638 A.2d 976 (Pa. Super. 1994). We cannot say that Mother's consent was intelligent, voluntary, and deliberate, as required, **Matter of Christopher P.**, 389 A.2d 94 (Pa. 1978), because Mother failed to receive the effective representation of counsel mandated by law. Our review of the record does not advance a procedure of fundamental fairness. Instead, there is clear and convincing evidence that it is more likely than not that the result herein would have been different absent counsel's ineffective assistance. **In re K.D.**, 871 A.2d 823, 829 (Pa. Super. 2005).[5]

Decrees vacated.

_____

[5] The orphans' court's additional analysis under 23 Pa.C.S. § 2511(b) is irrelevant in this case. Section 2511(b) applies only to the involuntary termination of parental rights. In this case, CYS requested that the court confirm Mother's consent to adoption pursuant to 23 Pa.C.S. § 2504(a).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/28/17